TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

| | | |
|---|---|---|
| OPINION | : | No. 93-1205 |
| of | : | |
| | : | May 12, 1994 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| CLAYTON P. ROCHE | : | |
| Deputy Attorney General | : | |
| | : | |

THE HONORABLE GILBERT FERGUSON, MEMBER OF THE CALIFORNIA ASSEMBLY, has requested an opinion on the following questions relating to the San Joaquin Hills Transportation Corridor:

1.     Did the County of Orange have legal authority to abandon that portion of Newport Coast Drive previously known as Bonita Canyon Road to the San Joaquin Hills Transportation Corridor Agency?

2.     Did the County of Orange have legal authority to abandon that portion of Newport Coast Drive previously known as Pelican Hill Road to the San Joaquin Hills Transportation Corridor Agency?

3.     Is the Irvine Company precluded from further developing its property if Newport Coast Drive becomes a toll road?

4.     Did the San Joaquin Hills Transportation Corridor Agency give sufficient legal notice that it intended to charge a toll for use of Newport Coast Drive?

CONCLUSIONS

1.     The County of Orange had the legal authority to convey that portion of Newport Coast Drive previously known as Bonita Canyon Road to the San Joaquin Hills Transportation Corridor Agency.

2.     The County of Orange had the legal authority to convey that portion of Newport Coast Drive previously known as Pelican Hill Road to the San Joaquin Hills Transportation Corridor Agency.

3.     The Irvine Company is not precluded from further developing its property if Newport Coast Drive becomes a toll road.

4.     The San Joaquin Hills Transportation Corridor Agency gave sufficient legal notice that it intended to charge a toll for use of Newport Coast Drive.

## ANALYSIS

The San Joaquin Hills Transportation Corridor Agency ("Agency") is a public agency established in 1986 pursuant to the Joint Exercise of Powers Act (Gov. Code, § 6500 et seq.)[1] and special legislation (§ 66484.3). It consists of the County of Orange and the cities of Costa Mesa, Dana Point, Irvine, Laguna Hills, Laguna Niguel, Mission Viejo, Newport Beach, San Clemente, San Juan Capistrano, and Santa Ana. Its main purpose is to oversee the construction of a 17-mile transportation corridor between San Juan Capistrano and Newport Beach. (See *Committee of Seven Thousand* v. *Superior Court* (1988) 45 Cal.3d 491, 495-497.)

The questions presented herein relate to the last approximately two miles of the corridor consisting of the northerly portion of Newport Coast Drive. This segment was previously a part of Bonita Canyon Road and what was known as Pelican Hill Road. These two roads were connected in 1991 as a result of a development agreement executed by the County of Orange and the Irvine Company, a private land developer. (See §§ 65864-65869.5.)

Pursuant to its statutory authority, the Agency will collect tolls at numerous points along the corridor. A 25-cent toll will be imposed on those persons using Newport Coast Drive at its connection with the last several miles of the corridor. It is the placement of this particular toll booth which has precipitated the questions presented for our analysis.[2]

1.     Did the County Have Legal Authority To Abandon Bonita Canyon Road?

The procedures governing the abandonment of public streets and highways by cities and counties are set forth in the Public Streets, Highways, and Service Easements Vacation Law (Sts. & Hwys. Code, §§ 8300-8336). Streets and Highways Code section 8309 is controlling herein. It provides: "`Vacation' means the complete or partial abandonment or termination of the public right to use a street, highway, or public service easement."

For an abandonment of a public thoroughfare to occur (i.e. "vacation"), the public's right to use the thoroughfare must be terminated. (*City of San Pablo* v. *East Bay Mun. Utility Dist.* (1977) 75 Cal.App.3d 609, 612-613; *City of Rancho Palos Verdes* v. *City Council* (1976) 59 Cal.App.3d 869, 885-887, 891; *People ex rel. Dept. Pub. Wks.* v. *Vallejos* (1967) 251 Cal.App.2d 414, 418-419; *Stevenson* v. *City of Downey* (1962) 205 Cal.App.2d 585, 590-591.) As stated in *City of Los Angeles* v. *Fiske* (1953) 117 Cal.App.2d 167, 172: "The act of vacating can be done only upon a finding that the property in question is unnecessary for present or future uses as a street. (Sts. & Hwys. Code, §§ 8300-8331.)"

---

[1]All references hereafter to the Government Code are by section number only.

[2]The concern expressed by some property owners is that people will avoid this section of the corridor because of the toll and will instead use other public streets generating traffic in their particular locality.

In the situation herein, the portion of Newport Coast Drive at issue (former Bonita Canyon Road) will be utilized as an integral part of the transportation corridor. The segment is necessary for both present and future use as a public highway. No legal abandonment by the county has or will take place.

Insofar as Newport Coast Drive will become a freeway or expressway (albeit one upon which a toll is exacted), section 941.1 of the Streets and Highways Code provides:

"The board of supervisors may lay out, acquire, construct, and maintain any section or portion of any street or highway within the county as a freeway or expressway and may make any existing street or highway a freeway or expressway."[3]

In answer to the first question, therefore, we conclude that the Agency, as a joint exercise of powers agency having the authority to exercise any common power of its constituent agencies (§§ 6502, 6508), had the authority to convert the present northerly portion of Newport Coast Drive (formerly Bonita Canyon Road) into the road system of the transportation corridor.

2.     Did The County Have Legal Authority To Abandon Pelican Hill Road?

While Bonita Canyon Road was an existing street at the time the Agency was formed, the other portion of Newport Coast Drive requiring examination was built in 1991 by the Irvine Company as part of its development agreement with the county. This portion lies within the City of Irvine.

Did the county properly abandon Pelican Hill Road? Just as no "abandonment" has occurred with respect to Bonita Canyon Road, the county has not "abandoned" this portion of what is now Newport Coast Drive. We conclude that the county had the legal authority to convey Pelican Hill Road to the Agency.

In 1988 the county and the City of Irvine utilized the provisions of sections 1700-1706 of the Streets and Highways Code to make Pelican Hill Road a county highway. Streets and Highways Code section 1700 provides that a county board of supervisors may "declare any highway in the county lying in whole or in part within a city to be a county highway" for various purposes, including the acquisition of rights-of-way and improving the highway. The county accepted the dedication of this particular right-of-way as part of the development agreement executed with the Irvine Company. When the improvements were completed, the board of supervisors took action pursuant to section 1704 of the Streets and Highways Code to declare the road no longer a county highway.

The county and the Agency's constituent cities are authorized to "contribute [to the Agency] . . . rights-of-way . . . toward the expense of building, acquiring, and maintaining the" transportation corridor.[4] Subdivision (f) of section 66484.3 provides:

---

[3]Similar authority is granted to cities in section 1800 of the Streets and Highways Code.

[4]Section 66484.3, subdivision (f) grants to the Agency the powers set forth in the El Dorado County Toll Tunnel Authority Act (Sts. & Hwys. Code, §§ 31100-31246).

"The county or a city imposing fees pursuant to this section may incur an interest-bearing indebtedness for the construction of bridge facilities or major thoroughfares. The sole security for repayment of the indebtedness shall be moneys in planned bridge facilities or major thoroughfares funds. A city or county imposing fees pursuant to this section may enter into joint exercise of powers agreements with other local agencies imposing fees pursuant to this section, for the purpose of, among others, jointly exercising as a duly authorized original power established by this section, in addition to those through a joint exercise of powers agreement, those powers authorized in Chapter 5 (commencing with Section 31100) of Division 17 of the Streets and Highways Code for the purpose of, constructing bridge facilities and major thoroughfares in lieu of a tunnel and appurtenant facilities, and, notwithstanding Section 31200 of the Streets and Highways Code, may acquire by dedication, gift, purchase, or eminent domain, any franchise, rights, privileges, easements, or other interest in property, either real or personal, necessary therefor on segments of the state highway system, including, but not limited to, those segments of the state highway system eligible for federal participation pursuant to Title 28 of the United States Code. . . ."

Section 31230 of the Streets and Highways Code states:

"Any city, county, district, or political subdivision of the state upon the request of the authority may advance or contribute money, rights-of-way, labor, materials, and other property toward the expense of building, acquiring, and maintaining the toll tunnel, and for preliminary surveys and the preparation of plans and estimates of cost thereof and other preliminary expenses. . . ."

Accordingly, the county and the City of Irvine were authorized to contribute to the Agency the northerly portion of Newport Coast Drive and the right-of-way previously dedicated to the county by the Irvine Company for the construction of the transportation corridor. The Agency, as part of the entire transaction, additionally acquired the fee title to the underlying property of the right-of-way when it granted "fee credits" to the company.[5] The Agency, in effect, purchased the underlying fee.

In answer to the second question, therefore, we conclude that the Agency now has complete jurisdiction over the northerly portion of Newport Coast Drive, having acquired it from the county, the City of Irvine, and the Irvine Company. The county had legal authority to convey Newport Coast Drive to the Agency.[6]

---

[5]The Agency has a fee system imposed upon benefitted developers with respect to the transportation corridor. It may issue fee credits to developers who dedicate rights-of-way for the corridor.

[6]Two additional questions were presented concerning the notice and hearing requirements for the county to abandon Newport Coast Drive. Since no legal abandonment occurred, these questions are moot. No issue has been raised concerning the county's compliance with the agenda, notice, and hearing requirements of the Ralph M. Brown Act (§§ 54950-54962) applicable to the meetings of boards of supervisors in general. Neither section 66484.3 nor the Streets and Highways Code requires any special notices or hearings with respect to the county's activities in question.

3.    May The Irvine Company Further Develop Its Property?

The third question concerns the Irvine Company's continued development of its property in light of Newport Coast Drive becoming a toll road. As previously indicated, the company built this portion of Newport Coast Drive as part of its development agreement with the county to reduce traffic congestion in the general area. Will traffic patterns change because of the toll booth, and if so, how would such change affect the company's right to continue developing its property?[7]

Initially, we note that the Irvine Company has kept its "bargain" under the development agreement with the county; it has built the road in question. It has not failed to perform any of the conditions of its permit. A development agreement is generally "enforceable by any party thereto notwithstanding any change in any applicable general or specific plan, zoning, subdivision, or building regulation adopted by the city, county, or city and county entering the agreement . . . ." (§ 65865.4; see *City of West Hollywood* v. *Beverly Towers, Inc.* (1991) 52 Cal.3d 1184, 1193, fn. 6; *Native Sun/Lyon Communities* v. *City of Escondido* (1993) 15 Cal.App.4th 892, 910; *Midway Orchards* v. *County of Butte* (1990) 220 Cal.App.3d 765, 773.) Under the present circumstances, it cannot be reasonably asserted that the company must now stop its development activities if Newport Coast Drive becomes a toll road.

Furthermore, the underlying contention (that traffic patterns will revert to what they were before the Irvine Company completed the North Coast Drive connection) cannot be demonstrated to be true. One traffic study with respect to the corridor (Technical Memorandum TM-2-67A) states in part:

". . . Since few parallel routes exist along much of the SJHTC, toll and toll free traffic estimates should be similar in magnitude and such is the case. Minor shifts in daily traffic assignments are from the Corridor to the Freeways (in the toll operation scenario) *with arterials realizing little or no impact . . . .*" (Emphasis added.)

Additionally, the Agency has determined specifically with respect to the Newport Coast Drive toll booth:

"The `so-called' by-pass route is enhanced, *not* damaged, by the Corridor, primarily because traffic along [Pacific Coast Highway] southerly of Corona del Mar creates the need for the by-pass; and this same `reservoir' of traffic will be reduced from 46,000 trips/day in the year 2010 to approximately 31,000 trips per day (see Figure 1.3.1. of the EIR.)

"The toll booths installed on the Corridor at the Pelican Hill Road interchange will toll northbound traffic in proportion to the remaining (northerly) reach of the Corridor, at a rate of $.15/mile. This toll will be approximately $.50 per

---

[7]A separate aspect of this question concerns the local coastal program for the area of the Irvine Company's development and requirements imposed under the California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq.) which is administered by the California Coastal Commission. (See 70 Ops.Cal.Atty.Gen. 220 (1987).) The commission's staff has determined that placing a toll booth at Newport Coast Drive will not violate any requirements imposed under the California Coastal Act of 1976. We have been presented with no evidence or legal arguments requiring a contrary conclusion.

each directional trip. The southbound direction is tolled in a similar manner. *It is unlikely that these nominal tolls would impede travel demand that would otherwise suffer a time delay along the conjectured diversion route*." (Emphasis added.)

Even assuming that other traffic studies support a contrary view of the effects of the Newport Coast Drive toll booth, we must presume that the Agency has properly performed its official duties with respect to this factual controversy. (See Evid. Code, § 664; *Erven* v. *Board of Supervisors* (1975) 53 Cal.App.3d 1004, 1012.)

In answer to the third question, therefore, we conclude that the Irvine Company is not precluded from further developing its property if Newport Coast Drive becomes a toll road.

4.      Did The Agency Give Sufficient Legal Notice That it Intended to Charge a Toll?

It is conceded that the Agency may place toll booths on those portions of the transportation corridor over which it has obtained legal jurisdiction. The final question to be resolved is whether the Agency gave sufficient legal notice that it was going to impose a toll for use of Newport Coast Drive. We conclude that it did.

First, we note that beginning in October of 1988, newspaper articles published the Agency's proposal that a toll booth would be placed at Pelican Hill Road, now a portion of Newport Coast Drive. More importantly, the proposed toll booth was included on maps accompanying the notice of hearings sent by the Agency with respect to its required environmental impact report and on maps contained in notices published in newspapers of general circulation in the county. Notices of such hearings were sent to 4500 public agencies, interested parties and associations, and members of the public who were on record as requesting such notices. (See Pub. Res. Code, §§ 21092, 21092.1.) The Agency responded to letters from the public addressing the question of imposing a toll for use of North Coast Drive and its impact upon future traffic patterns. (See Cal. Code Regs., tit. 14, §§ 15087-15088; *Marin Mun. Water Dist.* v. *KG Land California Corp.* (1991) 235 Cal.App.3d 1652, 1666.)

Other than the requisite hearings held by the Agency on its environmental impact report (six major noticed public meetings and hearings were held prior to certification of the final environmental impact report and approval of the transportation corridor), we are unaware of any law which required the Agency to hold meetings to specifically discuss the imposition of tolls or the proposed locations of the toll booths.[8] In answer to the fourth question, therefore, we conclude that the Agency gave sufficient legal notice that it intended to charge a toll for use of Newport Coast Drive.

\* \* \* \* \*

---

[8]Nevertheless, the Agency and several of its constituent members conducted public hearings regarding the proposal to operate the transportation corridor as a toll road system. Nine such meetings were held between October 10, 1990, and March 4, 1991, in Irvine, Laguna Beach, Laguna Niguel, Santa Ana, and San Clemente.